JOHNSTONE, Justice.
Lessie Jackson appeals a judgment establishing the boundary line between her property and the property owned by Malcolm Strickland and Malcolm Strickland, Jr. We reverse and remand.
The Stricklands sued Jackson and others for cutting timber from the Strick-lands’ property. The Stricklands asserted claims of negligence, wantonness, and conversion. Thereafter, the parties agreed that, before any of the Stricklands’ tort claims could be decided, the trial judge had to determine the boundary line between the respective properties owned by the StricMands and Jackson. The parties *994 agreed also to a severance of the tort claims from the boundary line dispute.
At trial on the boundary line dispute, Jackson contended that she and her predecessors in title had adversely possessed between the two disputed boundary lines, an area encompassing approximately three or four acres. After receiving evidence, including oral testimony, at trial, the trial judge entered a judgment:
“This is a statutory boundary line action brought pursuant to the Code of Alabama, 1975, § 35-3-1 et seq. The court having considered the pleadings, the evidence received ore tenus, and the arguments of counsel finds:
“(1) that the court has jurisdiction of the parties, the cause and the subject matter of the cause; and
“(2) that [the Stricklands] own[ ] the following described real estate in Barbour County, Alabama: NW 1/4 of SW 1/4 of Section 9, Township 9 North, Range 27 East; and
“(3) that [Jackson] owns the following described real estate in Barbour County, Alabama: NE 1/4 of SE 1/4 of Section 8, Township 9 North, Range 27 East; and
“(4) that á dispute exists as to the true common boundary line of said properties.
“It is, therefore, ORDERED, ADJUDGED AND DECREED by the court that the true common boundary line of said properties be and hereby is fixed as follows:
“The North South line between the ‘Jackson Property’ and the ‘Strickland Property’ as shown on the attached Exhibit ‘A’; this line is further described as running due South from the Water Oak tree and Sweet Gum Tree as shown on the attached Exhibit ‘A’, being designated as numbers four and five and running due South the entire length of the NW 1/4 of the SW 1/4 of Section 9, T9N, R27E, so that the Strickland property lies East of said line and the Jackson property lies West of said line.
“ORDERED that the Clerk cause a certified copy of this Judgment to be recorded in the office of the Judge of Probate of Barbour County, Alabama and that the cost of the certified copy and recording fees be taxed as costs.”
The boundary line described by this first judgment was a straight line, due north and south. The Stricklands moved to alter, amend, or vacate the judgment. Following arguments of counsel, a new trial judge entered an order vacating the judgment establishing the boundary line.
After some procedural activity which does not affect the analysis of this case, the new trial judge entered a new judgment:
“This is a statutory boundary line action brought pursuant to the Code of Alabama, 1975, § 35-3-1 et seq. The court having considered the pleadings, the evidence received ore tenus, and the arguments of counsel finds:
“(1) that the court has jurisdiction of the parties, the cause and the subject matter of the cause; and
“(2) that [the Stricklands] own[ ] the following described real estate in Barbour County, Alabama: NW 1/4 of SW 1/4 of Section 9, Township 9 North, Range 27 East; and
“(3) that [Jackson] owns the following described real estate in Barbour County, Alabama: NE 1/4 of SE 1/4 of Section 8, Township 9 North, Range 27 East; and
“(4) that a dispute exists as to the true common boundary line of said properties.
“It is, therefore, ORDERED, ADJUDGED AND DECREED by the court that the true common boundary *995 line of said properties be and hereby is fixed as follows:
“Starting at a concrete monument at the Southwest corner of the Northwest 1/4 of the Southwest 1/4 of Section 9, Township 9 North, Range 27 East, in Barbour County, Alabama (Also being the Southeast corner of the Northeast Quarter of the Southeast Quarter of Section 8), also being the POINT OF BEGINNING, go along the West line of the Northwest 1/4 of the Southwest Quarter of Section 9 North 3 degrees 41 minutes West 842.6 feet; thence North 25 degrees 57 minutes East 237.6 feet; thence North 6 degrees 57 minutes East 140.3 feet; thence North 0 degrees 24 minutes West 123.3 feet to the North line of the said Northwest 1/4 of the Southwest 1/4 of Section 9, also being the POINT OF ENDING (said POINT OF ENDING being located North 88 degrees 55 minutes East 150.7 feet from a concrete monument at the Northwest corner of the Northwest 1/4 of the Southwest 1/4 of Section 9, as shown on the attached Exhibit ‘A’).
“ORDERED that the Clerk cause a certified copy of this Judgment to be recorded in the office of the Judge of Probate of Barbour County, Alabama and that the cost of the certified copy and recording fees be taxed as costs.”
The boundary line described in this second judgment is an irregular line consisting of four segments at varying angles to the joining segment or segments. Although the new trial judge stated in the judgment that he heard testimony, it is undisputed that the new trial judge only reviewed the testimony adduced at the original trial. The new trial judge himself did not hear any testimony before rendering judgment.
On appeal to us, Jackson contends that the judgment rendered by the new trial judge is not supported by credible evidence. Ordinarily, “[a] judgment establishing a boundary line between coterminous landowners on evidence submitted ore tenus is presumed correct and need only be supported by credible evidence.” Garringer v. Wingard, 585 So.2d 898, 899 (Ala.1991) (quoting Tidwell v. Strickler, 457 So.2d 365, 367 (Ala.1984)). However, where “[t]he testimony was taken by depositions” or was taken in a previous proceeding, “[t]here is ... no presumption of the correctness of the conclusion of the circuit court.” Smith v. Cook, 220 Ala. 338, 341, 124 So. 898, 900 (1929). See also Eldridge v. Loftis, 723 So.2d 562 (Ala.1998); Hamrick v. City of Albertville, 238 Ala. 82, 189 So. 545 (1939); Burleson v. Clark, 232 Ala. 119, 167 So. 263 (1936); Taylor v. Cowart, 228 Ala. 317, 153 So. 403 (1934); Jones v. Stollenwerck, 218 Ala. 637, 119 So. 844 (1928). “[I]n deciding appeals, no weight shall be given the decision of the trial judge upon the facts where the evidence is not taken orally before the judge, but in such cases the Supreme Court shall weigh the evidence and given judgment as it deems just.” § 12-2-7(1), Ala.Code 1975.
The parties own adjoining properties described as quarter-quarter sections. They are side by side, ostensibly adjoining at the section line dividing Section 8 from Section 9 in the township. Jackson owns the quarter-quarter on the west side of the boundary, and the Stricklands own the quarter-quarter on the east side of the boundary.
Specifically, Jackson, her two sisters, and her nephew own the northeast quarter of the southeast quarter of Section 8, Township 9, Range 27, in Barbour County. Jackson and her relatives inherited the property in December 1992. The property has been in Jackson’s family since the early 1900s. The Stricklands own the *996 northwest quarter of the southwest quarter of Section 9, Township 9, Range 27, all on the east side of Jackson’s property, in Barbour County. The Stricklands purchased the property at an “estate sale” on the courthouse steps in March 1994. They purchased the property from the estate of Lillie Mae Daniels. In 1995 Jackson hired a timber company to cut timber off her property.
We will summarize Jackson’s testimony. She had lived in Connecticut for 55 years. When she was a little girl, she, her mother, and her grandparents had lived on the property she and her relatives had inherited. Jackson and her grandfather “walked over” the property several times. Before she moved to Connecticut, she and her grandfather went fishing and her grandfather stated, “I’m showing you [the boundary line] because I’ll be gone one day, and I want someone to know where everything is.” Her grandfather showed her a barbed wire fence that was very old. Part of the fence had fallen down. She did not how long the fence had been there. Her grandfather had put a “stob” down to mark the boundary line. The “stob” was at the end of the barbed wire fence.
Jackson had given a man, Bob Hines, permission to hunt on her property. Seven years before trial, Hines had driven her and one of her sisters over the property, and they had passed the barbed wire fence. Jackson had Hines stop the vehicle so that she could look at the fence. The fence was the same fence her grandfather had shown her years before.
We will summarize the testimony of Marvin Mayo, the nephew of Lillie Mae Daniels, deceased. He owns the property which adjoins Jackson’s property to the north. He had lived in the area for 68 years, his whole life, and he had been on the property owned by the Stricklands to hunt, fish, and farm. He was familiar with the property owned by Jackson and familiar with the north-south boundary line between the Stricklands’ property and Jackson’s property. The north-south boundary line starts at “a forked tree, a big oak tree,” where a barbed wire fence ended. The barbed wire fence ran east and west along the northern boundary of Jackson’s property and ended at the corner where four properties met. The four properties were owned by the Stricklands, Jackson, himself, and Ronnie Cooper, who owned the property north of the Stricklands’ property and which adjoined his property to the east.
Mayo testified further that there had been a metal “pin” or “stob” by the big oak tree at the end of the barbed wire fence. The pin or stob marked the north end of the north-south boundary between the Stricklands’ property and Jackson’s property. The pin or stob had been in place as long as he could remember and it had remained in place until the Stricklands bought Mayo’s aunt’s property. The Stricklands knew that the north-south boundary ran south of the pin or stob because Mayo had shown them the boundary line when they bought the property. Mayo and Cooper used the pin or stob as marking the north-south boundary line between their properties to the north.
Mayo testified further that in 1995 he showed the north-south boundary line between the Stricklands’ property and Jackson’s property to the owner of the timber company hired by Jackson to cut timber on her property. The timber company cut timber on Jackson’s property down the north-south boundary line between the Stricklands’ property and Jackson’s property, and the timber company “cut it right.”
Darryl Watford, who owned the timber company hired by Jackson, testified that in the early part of 1995 he had cut timber *997 for Jackson. He confirmed Mayo’s testimony that Mayo had shown him the north-south boundary line between the Strick-lands’ property and Jackson’s property. He stated that he and his crew had cut timber on Jackson’s property along the north-south boundary line indicated by Mayo.
We will summarize the testimony of Malcolm Strickland, Jr. He and his father bought their property at a courthouse auction in 1994. After purchasing the property, he talked to Mayo and “tried to get him to show me property lines.” Mayo “looked at the property lines and couldn’t never find a fence.” In late 1994 Jackson “was down at her house. And me and my father went out to talk to her.” “[W]e had Mrs. Jackson in the truck and rode her around the property. And Mrs. Jackson wasn’t sure on the property.” Jackson did not know the location of any of the property lines. Strickland asked Jackson whether she was interested in having the property surveyed, and Jackson told him she would pay half of the survey cost because she was not sure of the property lines. He did not have the property surveyed. “[T]he next thing [he] knew timber had been cut.”
Strickland testified further that he hired Bill Barrett to survey the property that he and his father owned. He gave Barrett a copy of the deed that he and his father had received. On cross-examination, Strickland stated that he asked Jackson to pay for part of the cost of the survey and that Jackson refused to pay part of the costs of the survey. On examination by the original trial judge, Strickland admitted that, before they bought their property, he and his father had looked for the north-south boundary line between Jackson’s property and the estate’s property, and that they thought the north-south boundary line “was at a big oak tree.” He admitted also seeing the old barbed wire fence, but denied thinking the fence indicated a boundary line. Strickland admitted that a “pin” marked the north-south boundary line between Mayo’s property and Cooper’s property, but denied that the “pin” marked the north-south boundary line between the Strickland property and Jackson’s property.
When Malcolm Strickland, the father, was asked whether he agreed with his son’s testimony, he testified:
‘Well, most of it. When the judge was asking about Ronnie Cooper’s land, the only thing, when Ronnie bought his land from somebody else the line was — what they were calling the line there, he had to agree with whatever they had been calling it because it had been there so long. So, he didn’t have any choice on whether to dispute it or try to do anything about that line. So, that wouldn’t have any effect on me.”
We will summarize the testimony of Bill Barrett, a licensed surveyor. He looked at the Stricklands’ deed and the other adjoining landowners’ deeds. When he surveyed the Stricklands’ property, he did not find any physical evidence of the corners of the property. He “did not rely on any evidence that we found out there.” While surveying the disputed area, Barrett noted “Water oak (21.9” DBH), barbed wire in tree appears to run north-south forming an east line to the Jackson property” and an “iron stake ... at the base of an oak tree that has old wiring that runs east and west and south.” (Emphasis added.) He discounted the barbed wire fence as marking the north-south boundary line between the Stricklands’ property and Jackson’s property and considered the fence as being an old field fence. Barrett did not find any markings south of the iron stake or rebar. The “rebar iron pin” was at the *998 end of the barbed wire fence by the big oak tree.
Barrett testified that he determined the north-south boundary line by using the Stricklands’ deed and a copy of a 1973 aerial photograph that he obtained from the Barbour County tax office. For the benefit of the trial judge, he located the “iron stake” on the photograph because someone had removed the iron stake from the property before trial.
Barrett did not find physical evidence of the four corners of “this 40. The 40 quarter.” In determining the north-south boundary line between Jackson’s property and the Stricklands’ property, Barrett ignored the “iron stake” and all other landmarks and established “the four corners of the section and prorated the quarter quarter section back in to establish the quarter quarter section as it should have been according to the original survey of 1823.” (Emphasis added.) Barrett next established the four corners of the Stricklands’ property and then did “the calculations and plot[ted] it up and [made] a determination where the line — -in our opinion of where the line should go.” Barrett placed concrete “monuments” on what he determined were the four corners of the Strick-lands’ property and determined the north-south boundary line by drawing a line from the northwest corner to the southwest corner. He marked the north-south boundary line with blue paint. He did not investigate the location of the recognized boundary line between the Stricklands’ property and Jackson’s property.
The original trial judge recalled Mayo. Mayo testified that the boundary line between Jackson’s property and his aunt’s property, now the Stricklands’ property, was marked by leaving old trees down the line. The north-south boundary line was marked by the “old pin” by the stump of an old oak tree. Mayo could go out and mark the north-south boundary line between the Stricklands’ property and Jackson’s property all the way down the line. The area in dispute between the boundary line marked by Barrett without reference to the pin and the true boundary line running south from the pin was four or five acres. Mayo and Cooper had never disagreed about their north-south boundary line. Mayo and Cooper used the pin or stob to determine the north-south boundary line between their properties. The north-south boundary line marked by the pin or stob had always been the boundary line between Cooper’s property and his property and between Jackson’s property and the Stricklands’ property. The north-south boundary line between all four properties had always been a straight line.
In this case, because the new trial judge did not hear any testimony, the judgment of the trial court is not accorded a presumption of correctness. Smith, supra. The new trial judge adopted the metes and bounds supplied by Barrett to describe the boundary line between Jackson’s property and the Stricklands’ property in the second judgment. While Barrett had first decided to establish an appropriate section line as the boundary line, he then decided to put a hard right dogleg and two left doglegs into the section line. The right dogleg was nearly 30 degrees off the initial course. (See the metes and bounds.) Barrett’s point of beginning was not any existing landmark proved by the evidence but was simply a concrete monument he himself had erected. Barrett did not disclose the doglegs on his survey, which reveals only a straight section-line-boundary-line canted uniformly 3 degrees 41 minutes west of north, which does not correspond to the metes and bounds he supplied and the second trial judge integrated into the second judgment. Barrett discounted the only proven landmark, the iron pin, and did not investigate the location of the recognized boundary line. Thus, Barrett’s survey and metes and *999 bounds description are not supported by any credible evidence or any credible landmark. Accordingly, the judgment rendered by the second trial judge is not supported by credible evidence.
The only credible landmark described by the evidence of record is the iron pin at the base of the oak tree at the north end of the parties’ adjoining properties, and the only credible testimony to the course and location of these parties’ boundary line is that it lay due north and south, with its north end at the pin at the base of the oak. Jackson presented credible and substantial evidence, § 12-21-12(a), Ala.Code 1975, which also constitutes the great weight of the evidence in this case, that the “iron pin,” “rebar,” or “stob” at the base of the oak tree marked the north end of the north-south boundary line between her property and the Strick-lands’ property and that that boundary line had been the recognized north-south boundary line for at least 55 years.[1] Accordingly, we reverse the judgment of the trial court and remand this cause for the trial court to establish a north-south boundary line lying due south from the base of the oak tree where the iron pin or “stob” was located, in accordance with the description in the judgment of the original trial judge.
REVERSED AND REMANDED WITH INSTRUCTIONS.
MOORE, C.J., and SEE, WOODALL, and STUART, JJ., concur.
HOUSTON and LYONS, JJ, recuse themselves.

. Jackson established that she and her predecessors-in-title had adversely possessed the land up to the iron pin.