BRYAN, Justice.
The Pantry, Inc. (“The Pantry”), and Herndon Oil Corporation (“Herndon Oil”), the defendants below, appeal separately from a judgment entered on a jury verdict in favor of Kaycee A. Mosley (“Kaycee”) and Alana M. Byrd (“Alana”), plaintiffs below. These appeals primarily concern whether Kaycee and Alana’s mother, Mu-rel Mosley (“Murel”), unreasonably withheld consent to Herndon Oil’s assignment of a lease between Murel and Herndon Oil. We reverse the judgment and remand the case.

Factual Background and Procedural History

In 1994, Murel executed a lease agreement in which she leased to Herndon Oil a gasoline station/convenience store and the underlying lot located in Loxley. The original term of the lease was for five years. The lease agreement gave Hern-don Oil the option of renewing the lease every five years, with a total of five additional five-year terms. The lease agreement provided that Murel was to receive rental payments in the amount of $650 per month for the original five-year term, $800 per month for the first renewed five-year term, $1,000 per month for the second renewed five-year term, $1,100 per month for the third renewed five-year term, $1,200 per month for the fourth renewed five-year term, and $1,300 per month for the fifth renewed five-year term. The lease agreement contained the following provision addressing Herndon Oil’s right to assign the lease: “Herndon [Oil] shall be entitled to transfer or assign this agreement with the written consent of [Murel], her heirs, executors or assigns[] (which shall not be unreasonably withheld).”
*154 On June 4, 2009, Herndon Oil’s attorney sent Murel a letter seeking her consent to assign the lease to The Pantry. The letter stated, in pertinent part:
“Herndon [Oil] has entered into an Asset Purchase Agreement to [sell assets regarding] several certain of its retail gasoline/convenience store locations to The Pantry, Inc. (the ‘Pantry’), a publicly-traded company that operates more than 1,400 convenience stores in the southeastern United States under the trade name ‘Kangaroo Express.’ One of the Herndon [Oil] business locations being [assigned] to the Pantry is the location it leases from you at U.S. [Highway] 90 and East Union Avenue in Loxley. Herndon [Oil] will assign its interest in the lease to the Pantry, and the Pantry will assume the obligations of Herndon [Oil] as of the closing date.
“I have enclosed an Estoppel Certificate and Consent for execution by you as the lessor under the existing lease.
“If you or your attorneys have any comments or questions, please contact me as soon as possible. This transaction is scheduled to close on June 25, 2009, [and] we would like to get this certificate executed as soon as possible.
“Beth Pierce, a local real estate agent in the Mobile area, has worked with Herndon [Oil] for many years and is available locally to pick up the document when it is signed. Ms. Pierce may be contacted at [the following telephone number]....
“I thank you in advance for your cooperation and prompt attention to this matter. If you have any additional questions, please do not hesitate to contact me.”
Beth Pierce, Herndon Oil’s real-estate agent, testified at trial that she visited Murel’s house, seeking to speak with her about the assignment. Kaycee, one of Mu-rel’s daughters, answered the door and told Pierce that Murel was unavailable because she was ill and that Pat Mosley (“Pat”), Murel’s son, was handling Murel’s business affairs. At the time, Murel had given Pat her power of attorney. Pierce testified that she left her business card with Kaycee and asked her to have Pat contact her. Pierce further stated that she went to Murel’s house a second time and that, when no one answered the door, she left her business card on the door. Pierce never actually spoke with Murel or Pat about the assignment.
On June 25, 2009, Herndon Oil assigned the lease to The Pantry, without Murel’s consent. There is no evidence indicating that Murel, Pat, or their representative ever discussed the assignment with Hern-don Oil or The Pantry before the assignment was made. Pierce testified that the assignment was part of a larger transaction between Herndon Oil and The Pantry in which Herndon Oil transferred its assets — primarily fee-simple ownership interests — in approximately 40 convenience stores to The Pantry. Pierce testified that the total transaction was worth “somewhere [around] $40 million” but that she did not know the specific value of the assignment of Murel’s lease. At the time of the assignment, Murel was 83 years old.
On July 2, 2009, Murel’s attorney sent Herndon Oil’s attorney a letter stating, in pertinent part:
“The [Mosley] family will not consent to the sublease of their gasoline/convenience store in Loxley, Alabama to The Pantry.... The monthly lease amount is not commensurate with the fair market value of like properties in the area. If you would like to discuss a fan-amount, please contact me immediately.
“Meanwhile, The Pantry ... has, without authorization, moved into the Loxley Store and is conducting business. *155 This is in violation of the Herndon [Oil] Lease. If we are unable to resolve this issue amicably, I will have no choice but to file suit against Herndon Oil and The Pantry....”
Herndon Oil never obtained consent to the assignment, and the lease agreement was never renegotiated. In November 2009, Murel sued Herndon Oil, alleging breach of contract and conversion. Murel later amended her complaint to add The Pantry as a defendant and to add claims alleging conspiracy and unjust enrichment. Murel died while the case was pending, and her daughters, Kaycee and Alana, were substituted as plaintiffs.
A jury trial was held in October 2011. At trial, the primary issue was whether Murel had unreasonably withheld her consent to the assignment of the lease. Alana testified at trial regarding Murel’s concerns with the assignment:
“Q. [By counsel for Kaycee and Alana:] Did your mother have concerns about somebody taking over from Hern-don [Oil]?
“A. Yes, she did, because she says they’re not in there with a lease because the other lease was up.
“Q. Now, explain that. What do you mean the other lease was up?
“A. Well, the five-year lease from Herndon Oil was up. And when [The] Pantry went in, they should have had us to renegotiate another lease with them because they’re in there with no signed lease.
[[Image here]]
“Q. Did you ever have conversations with your mother about why she didn’t — other than The Pantry didn’t have a lease, you just told us that, about any other reasons that she was concerned about somebody other than Herndon [Oil] going into this store?
“A. Well, she — she thought that [Herndon Oil] wasn’t giving her enough rent because some other people had told her the rents at the other stations were lots, lots higher than hers. And she just — she didn’t feel like she was getting the fair share.”
Pat testified that he began handling Mu-rel’s business affairs around 2003 and that he obtained Murel’s power of attorney in 2003 or 2004. At trial, Pat testified, in pertinent part:
“Q. [By counsel for the Kaycee and Alana:] At some point, did you see documents that your mother received via FedEx[, seeking her consent to the assignment]? ...
“A. Yes, sir, I saw this....
“Q. And the — did you and your mother have an occasion to talk about whether or not you would agree to have someone else come in on the lease?
“A. Yes, sir....
“Q. And what was the decision of your mother in terms of having the lease assigned?
“A. Well, we wanted to find out who The Pantry was, first thing.
“Q. Let me ask you that: Did you know The Pantry?
“A. No, sir.
“Q. Had you ever had any dealings with The Pantry?
“A. No, sir, only Herndon [Oil].
[[Image here]]
“Q. Were you able to find out if The Pantry was an Alabama company?
“A. No, sir, I didn’t know who they were.
“Q. Did you — did that give you or your mother concerns about signing a lease with a company that you did not know?
“A. Yes, sir.
*156 “Q. And the people that you did not know?
“A. Yes, sir.
“Q. Did it give you concerns about having an out of state company involved?
“A. Out of state was not the point. We just really wanted to know who they were, you know, coming into the property-
“Q. The — did you attempt to contact them, either yourself or through' your attorney?
“A. I contacted you and you contacted them.
[[Image here]]
“Q. [By counsel for Herndon Oil:] Well, did you contact Walley Hinesley, the attorney who wrote the letter, as he requested you do if you had any questions?
“A. No, sir, I never contacted him.
“Q. You never contacted him. Did you make any inquiry as to who the assignee was. The Pantry, The Kangaroo back then?
“A. Only when I contacted Mr. Riley[, Pat’s counsel],
[[Image here]]
“Q. The Pantry is a publicly traded company. It’s on NASDAQ, has more than a thousand stations. It’s a much bigger operation than a privately held operation by David Herndon. Did you make any effort, either by inquiring from Herndon [Oil] or The Pantry, or Google, or Yahoo, or your stockbroker, or the Wall Street Journal, or any other outside agency to find out who The Pantry was?
“A. Sir, it’s not my place when someone wants to come into our property. It’s their place to come deal with us.
[[Image here]]
“Q. You haven’t heard anything about The Pantry that would make them undesirable tenants, have you?
“A. No, sir. But I would appreciate someone coming to our house and talking to us about them coming in there so we would know that we were going to have good tenants.”
Pat also testified that he believed the lease agreement was unfair to Murel and that he considered Herndon Oil’s assignment request as an opportunity to renegotiate the lease agreement. When Herndon Oil sought Murel’s consent to the assignment, Herndon Oil was paying her $1,100 per month in rent. Pat opined that the actual rental value of the property at that time was $4,000 per month. Kaycee and Alana introduced, over Herndon Oil’s objection, evidence indicating that some other gasoline stations/convenience stores in the area were paying rental amounts of between $2,000 per month and $4,960 per month. Pierce, Herndon Oil’s real-estate agent, testified that some of those other properties were larger and different in type than Murel’s property. Pat testified that in 2004 he had approached Pierce about the possibility of renegotiating the lease agreement. Pierce indicated that Herndon Oil would likely be unwilling to renegotiate, and the lease agreement was never renegotiated. Pat testified as follows regarding the possibility of renegotiating the lease agreement when Herndon Oil sought consent for the assignment:
“Q. [By counsel for Herndon Oil:] The fact is that you wanted to negotiate the contract, didn’t you, the lease?
“A. Yes, sir.
“Q. You testified in your previous deposition that you had contacted the Herndon Oil Company more than once to get them to revise the lease agreement; is that correct?
“A. Yes, sir, that was years earlier.
*157 “Q. Yeah. And it seemed to you that this assignment agreement was the opportunity that you had been looking for to get them to rewrite the lease agreement; is that correct?
“A. It was an opportunity to have my mother have some fairness because they took advantage of her earlier in her life that I did not know about. I would never have let her sign that lease for what she signed it for.
“Q. ... [T]his whole case, then, is really about a lease that you didn’t like from the very time you saw it, is that correct, in 2003?
“A. The whole case is.
“Q. Yeah.
“A. Taking up for my mother, who was done wrong.
[[Image here]]
“A. I would be happy to talk to The Pantry. It’s not that I want to run them out. I just want to talk to The Pantry in order to renegotiate the lease. I would be happy to talk to anyone who would want to come in to renegotiate that lease, sir. It is — I mean, that is not a question of doing that. It’s not I think The Pantry are bad people or anything, I just think my mother got screwed over.”
Pat further testified:
“Q. [By counsel for Kaycee and Alana:] Is money the only reason that your mother would not consent to the assignment?
“A. No, sir. She wanted to know who The Pantry was also. I mean, money was—
“Q. Is that part of it?
“A. Part of it, yes. But she wanted to know who was going into her property also.”
The trial court entered a judgment as a matter of law (“JML”) on the conspiracy claim, but the trial court allowed the claims of breach of contract and conversion to go to the jury.[1] The jury returned a verdict against Herndon Oil on the breach-of-contract claim, awarding $70,280 in compensatory damages, and against Herndon Oil and The Pantry on the conversion claim, awarding $1 in compensatory damages and $620,000 in punitive damages. The trial court entered a judgment on the jury verdict. Herndon Oil and The Pantry filed a postjudgment motion for a JML or, alternatively, for a new trial or to alter, amend, or vacate the judgment; the trial court denied that motion. Herndon Oil and The Pantry also filed a postjudgment motion seeking a remittitur of the punitive damages and requesting a hearing on their motion. Following a hearing, the trial court denied the motion for a remittitur. Herndon Oil and The Pantry appealed separately, and we consolidated the appeals for the purpose of writing one opinion.

Standard of Review

“When reviewing a ruling on a motion for a JML, this Court uses the same standard the- trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of *158 fact, the ultímate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Flonda, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).

Analysis

On appeal, Herndon Oil argues that it was entitled to a JML on the breach-of-contract claim. As noted, the lease agreement between Herndon Oil and Murel required Herndon Oil to obtain Murel’s written consent before Herndon Oil could assign the lease. Herndon Oil did not obtain Murel’s consent to the assignment of the lease to The Pantry. However, the lease agreement also provided that Mu-rel’s consent “shall not be unreasonably withheld.” Herndon Oil argues that it did not breach the lease agreement by failing to obtain Murel’s consent to the assignment because, it says, her consent was unreasonably withheld.
As the tenant, Herndon Oil had the burden of proving that Murel, the landlord, acted unreasonably in withholding consent to the assignment. Rowley v. City of Mobile, 676 So.2d 316, 318-19 (Ala.Civ.App.1995) (“A tenant has the burden of proving that the landlord acted unreasonably in withholding consent to an assignment.”). The reasonableness of a landlord’s failure to consent to an assignment of a lease is judged in accordance with a commercial-reasonableness standard. 676 So.2d at 318 (citing Homa-Goff Interiors, Inc. v. Cowden, 350 So.2d 1035, 1038 (Ala.1977)).
In arguing that Murel unreasonably withheld her consent to the assignment, Herndon Oil focuses on evidence indicating that Murel’s consent was withheld in large part based on a belief that the lease agreement was unfair and that it should be renegotiated. Certainly, the evidence indicates that Pat, who had Murel’s power of attorney, considered the request for consent to the assignment as an opportunity to renegotiate the lease agreement. Pat testified:
“Q. [By counsel for Herndon Oil:] The fact is that you wanted to negotiate the contract, didn’t you, the lease?
“A. Yes, sir.
[[Image here]]
“Q. ... [I]t seemed to you that this assignment agreement was the opportunity that you had been looking for to get them to rewrite the lease agreement; is that correct?
“A. It was an opportunity to have my mother have some fairness because they took advantage of her earlier in her life that I did not know about. I would never have let her sign that lease for what she signed it for.
*159 “Q. ... [T]his whole case, then, is really about a lease that you didn’t like from the very time you saw it, is that correct, in 2003?
“A. The whole case is.
[[Image here]]
“A. I would be happy to talk to The Pantry. It’s not that I want to run them out. I just want to talk to The Pantry in order to renegotiate the lease. I would be happy to talk to anyone who would want to come in to renegotiate that lease.... ”
Similarly, Alana testified about Murel’s concerns with the proposed assignment: “[S]he thought that [Herndon Oil] wasn’t giving her enough rent because some other people had told her the rents at the other stations were lots, lots higher than hers. And she just — she didn’t feel like she was getting the fair share.” That position is also reflected in the July 2, 2009, letter Murel’s attorney sent Herndon Oil’s attorney, stating that consent to the assignment of the lease would not be granted unless the lease agreement was renegotiated. That letter stated, in pertinent part: “The monthly lease amount is not commensurate with the fair market value of like properties in the area. If you would like to discuss a fair amount, please contact me immediately.”
Alabama appellate courts apparently have not addressed the specific issue whether a landlord acts reasonably by refusing consent to an assignment in order that the landlord may to extract a higher rent than called for in the lease agreement. However, several other jurisdictions have concluded that it is unreasonable for a landlord to withhold consent to an assignment of a lease or to a sublease in order that the landlord may charge a higher rent or otherwise to improve the landlord’s economic position. One leading authority has succinctly stated the rule and its rationale, which we now adopt:
“It is ... unreasonable to deny consent in order that the landlord may charge a higher rent than originally contracted for, since the lessor’s desire for a better bargain than contracted for has nothing to do with the permissible purposes of the restraint on alienation, that is, to protect the lessor’s interest in the preservation of the property and the performance of the lease covenants.”
29 Richard A. Lord, Williston on Contracts § 74:22 at 379-80 (4th ed.2003). See, e.g.,[2] Norville v. Carr-Gottstein Foods Co., 84 P.3d 996, 1001 (Alaska 2004) (“It is not reasonable for a landlord to deny consent in order to charge a higher rent than he originally contracted for.”); Campbell v. Westdahl, 148 Ariz. 432, 438, 715 P.2d 288, 294 (Ct.App.1985) (“A landlord’s refusal to consent to an assignment because the landlord is unhappy with the low rent provided under the existing lease is unreason *160 able.”); Kendall v. Ernest Pestana, Inc., 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837 (1985) (stating that it was not commercially reasonable for a landlord to deny consent in order that the landlord may charge a higher rent than originally contracted for); 1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc., 485 A.2d 199, 210 (D.C.1984) (“[I]t is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position.”); Fernandez v. Vazquez, 397 So.2d 1171, 1174 (Fla.Dist.Ct.App.1981) (“Denying consent solely on the basis of personal taste, convenience or sensibility or in order that the landlord may charge a higher rent than originally contracted for have been held arbitrary reasons failing the tests of good faith and reasonableness under commercial leases.”); Funk v. Funk, 102 Idaho 521, 524, 633 P.2d 586, 589 (1981) (“[N]o desirable public policy is served by upholding a landlord’s arbitrary refusal of consent ... where ... it is apparent that the refusal to consent was withheld for purely financial reasons and that the landlord wanted the lessees to enter into an entirely new lease agreement with substantial increased financial benefits to the landlord.”); D.L. Dev., Inc. v. Nance, 894 S.W.2d 258, 260 (Mo.Ct.App.1995) (stating that a landlord’s conditioning consent to a proposed sublease on a renegotiation of the lease was unreasonable because it essentially amounted to “holding the consent to the sublease hostage for the ransom of renegotiating the lease”); Economy Rentals, Inc. v. Garcia, 112 N.M. 748, 819 P.2d 1306 (1991) (stating that a landlord’s refusing to consent to a sublease was unreasonable where the landlord’s real motivation was to increase the landlord’s economic benefit from the lease); First American Bank of Nashville, N.A. v. Woods, 781 S.W.2d 588, 590 (Tenn.Ct.App.1989) (stating that a landlord’s desire to extract an economic concession may not be reasonably considered by a landlord in determining whether to withhold consent); and Morgan Prods., Ltd. v. Park Plaza of Oshkosh, Inc., 229 Wis.2d 231, 239, 598 N.W.2d 626, 630 (Ct.App.1999) (“[I]t is not commercially reasonable if the sole basis for a consent denial is so that a landlord can charge a higher rent than the contract rent.”).[3]
Accordingly, we conclude that it is unreasonable for a landlord to withhold consent to an assignment of a lease in order that the landlord may extract higher rent than contracted for in the lease agreement. The purpose of a consent provision is to protect the landlord’s interest in preserving the property and in the performance of the lease covenants, not to protect the landlord’s general economic position. Wil-liston, supra. Thus, in this case, Murel’s and Pat’s desire to renegotiate the lease agreement was not a reasonable ground for withholding consent to the assignment.
Kaycee and Alana argue that Murel’s consent was reasonably withheld, contending that this case is on point with Rowley, *161 supra. In Rowley, the tenant, a restaurant proprietor, informed the landlord, the City of Mobile, that she had found someone willing to accept an assignment of her lease. 676 So.2d at 318. However, the tenant never identified the potential as-signee and never presented the landlord with a proposal for the assignment. The tenant sued the landlord, alleging that it had breached the lease contract by unreasonably withholding its consent to the assignment of the lease. The Court of Civil Appeals concluded that the landlord’s withholding of its consent was reasonable, stating that the tenant “did not provide the [landlord] with the name of, or any information about, a proposed assignee.” 676 So.2d at 320.
The Court of Civil Appeals in Rowley explained:
“[BJecause we believe a landlord cannot reasonably be expected to consent to an assignment of a lease without knowing the identity of, and having pertinent information about, a proposed assignee, we think the better reasoned decisions are those holding that a landlord does not unreasonably withhold consent to an assignment unless the landlord is presented with — and rejects — a prospective assignee who is ready to assume the lease and who meets commercially reasonable standards.
‘“[A] condition precedent to the lessor’s duty to accept a sublessee is the tender to him of a suitable tenant as a sublessee. Thus, before the [lessors] could possibly be held liable for failure to consent to a transfer of the lease, the [lessee] had the burden of proving that it had tendered a person who was “ready, willing and able” to take over the lease and who, at the very least, met reasonable commercial standards.’
“Jack Frost Sales, Inc. v. Harris Trust & Sav. Bank, 104 Ill.App.3d [933] at 944, 60 Ill.Dec. [703] at 711, 433 N.E.2d [941] at 949 [ (1982) ] (citations omitted).”
676 So.2d at 319-20.
This case, however, is factually distinguishable from Rowley. In Rowley, the tenant never provided the landlord with the identity of, or any information about, the proposed assignee. Thus, the landlord’s withholding of its consent was reasonable in that case. Conversely, in this case, Herndon Oil sent a letter to Murel indicating its intention to assign the lease to The Pantry, described in the letter as “a publicly-traded company that operates more than 1,400 convenience stores in the southeastern United States under the trade name ‘Kangaroo Express.’ ” Thus, the rationale for the landlord’s withholding its consent in Rowley is not present in this case.
We recognize that Pat testified that consent was withheld not only because he wanted to renegotiate the lease agreement, but also because he and Murel “wanted to find out who The Pantry was.” Pat testified that he “didn’t know who [The Pantry was],” that “we really wanted to know who they were,” and that he “would appreciate someone coming to our house and talking to us about them coming in there so we would know that we were going to have good tenants.” Rowley states that a tenant has the burden of providing sufficient information to the landlord indicating that the tenant ‘“had tendered a person who was “ready, willing and able” to take over the lease and who, at the very least, met reasonable commercial standards.’ ” 676 So.2d at 320 (quoting Jack Frost Sales, Inc. v. Harris Trust & Sav. Bank, 104 Ill.App.3d 933, 944, 60 Ill.Dec. 703, 711, 433 N.E.2d 941, 949 (1982)). However, in this ease, Herndon Oil more than once attempted to engage *162 Murel and Pat regarding the proposed assignment, but to no avail. Furthermore, even if those attempts had been successful, in this case any additional information provided to Murel and Pat regarding the proposed assignment would have made no difference. There is no evidence indicating that The Pantry was unable to accept the assignment or that it did not meet reasonable commercial standards. In fact, Pat testified that he had not heard anything about The Pantry being an undesirable tenant, that he “would be happy to talk to The Pantry.... to renegotiate the lease,” and that “[fit’s not [that he] thinks The Pantry are bad people.” Had Herndon Oil provided Murel and Pat additional information about The Pantry before the assignment, that information would not have alleviated Murel’s and Pat’s overriding concern that the lease agreement was unfair and should be renegotiated. As Pat conceded at trial, that concern is what this “whole case” is about. However, as we have concluded, the desire to renegotiate the lease agreement was not a reasonable ground on which to withhold consent to the assignment of the lease.
We conclude that Murel unreasonably withheld consent to the assignment of the lease from Herndon Oil to The Pantry. Thus, Herndon Oil had the right under the lease agreement to assign the lease to The Pantry despite Murel’s failure to consent. Therefore, Herndon Oil did not breach the lease agreement, and we reverse the judgment entered against Herndon Oil on the breach-of-contract claim.
Herndon Oil and The Pantry also argue that they were entitled to a JML on the conversion claim brought against them. We agree. We note initially that “Alabama law defines conversion as the exercise of dominion of another over personal property to the exclusion of or in defiance of the owner’s right.” Davis v. Huntsville Prod. Credit Ass’n, 481 So.2d 1103, 1107 (Ala.1985) (emphasis added). See also 1 Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law § 29.01 (5th ed.2010) (stating that conversion “is a wrongful taking or wrongful detention or interference, illegal assumption of ownership or illegal use or misuse of another’s personal property”). “An action for conversion will not lie for the taking of real property ... nor will it lie for the taking of personal property that has been incorporated into real property.” Baxter v. SouthTrust Bank of Dothan, 584 So.2d 801, 805 (Ala.1991). The conversion claim appears to be based solely on the allegation that Herndon Oil and The Pantry “converted” the leased premises in this case through the alleged wrongful assignment of Herndon Oil’s lease to The Pantry; there is no evidence indicating that personal property unincorporated into the real property was converted.[4] Even assuming, without deciding, that an assignment could give rise to a “conversion” in this way, the conversion claim fails; because Herndon Oil had the right under the lease agreement to assign the lease to The Pantry and The Pantry thus had the right to occupy and use the premises, neither Herndon Oil nor The Pantry could be liable for conversion. Accordingly, we also reverse the judgment entered against Herndon Oil and The Pantry on the conversion claim.
Based on the foregoing, we reverse the judgment entered against Herndon Oil and The Pantry, and we remand the case for proceedings consistent with this opinion. Because we are reversing the trial court’s judgment, we pretermit consideration of *163 the other arguments raised by Herndon Oil and The Pantry.
1110759 — REVERSED AND REMANDED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.
1110839 — REVERSED AND REMANDED.
STUART, BOLIN, PARKER, MURDOCK, SHAW, MAIN, and WISE, JJ., concur.
MOORE, C.J., dissents.

. The trial court did not appear to instruct the jury on the unjust-enrichment claim, and the jury did not return a verdict on that claim. We note that,
"if, in a case of claims to be tried by a jury, ... the trial court does not of record formally reserve or sever a claim for separate disposition, the omission of that claim from the judgment actually entered will be deemed a judgment on the merits of that claim adverse to the claimant."
Alfa Life Ins. Corp. v. Jackson, 906 So.2d 143, 153 (Ala.2005).

. Some of the cases that follow concern an assignment, and some concern a sublease.
"In general terms, the difference between an assignment and a sublease is that an assignment transfers the lessee's entire interest in the property, whereas a sublease transfers only a portion of that interest, with the original lessee retaining a right of reentry at some point during the unexpired term of the lease....
"... [W]hether the tenant's transfer of his leasehold interest constitutes an assignment or a sublease is not legally significant as to whether the landlord acts 'unreasonably' in refusing to consent....”
69 Am.Jur. Proof of Facts 3d 191, Circumstances Establishing Landlord’s Unreasonable Withholding of Consent to Assignment or Sublease § 4 (2002) (footnotes omitted). See, e.g., Kendall v. Ernest Pestana, Inc., 40 Cal.3d 488, 493 n. 2, 220 Cal.Rptr. 818, 820 n. 2, 709 P.2d 837, 839 n. 2 (1985) ("Since the present case involves an assignment rather than a sublease, we will speak primarily in terms of assignments. However, our holding applies equally to subleases.”).

. Although Alabama has not directly addressed the question presented here, this Court has stated:
" "There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract; ... in every contract there exists an implied covenant of good faith and fair dealing.” ’ ” (quoting Sellers v. Head, 261 Ala. 212, 73 So.2d 747, 751 (1954))[], See also Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.”).’ Hunter v. Wilshire Credit Corp., 927 So.2d 810, 813 n. 5 (Ala.2005)(quoting Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 267 (Ala.2002)).”
Shoney’s LLC v. MAC East, LLC, 27 So.3d 1216, 1220 n. 5 (Ala.2009).

. This is reflected by the trial court's instructing the jury that "if you find that there was no , breach of the contract by Herndon Oil ..., then the PIaintiff[s] ha[ve] no right to recover under the claim of conversion.”