PITTMAN, Judge.'
Steve Evans appeals from a judgment of the Walker Circuit Court in favor of W.G. Waldrop for unpaid rent. We affirm the trial court’s judgment. ,,

*1068
Procedural History

In 1999, Evans leased from Waldrop a piece of commercial real property (“the property”), which was part of a larger commercial shopping center. The lease term commenced on April 1, 1999, and ended on March 1, 2004. Evans stopped paying rent after May 2000. Accordingly, Waldrop sued Evans, alleging a breach of the lease agreement. In defense, Evans asserted that Waldrop had unreasonably withheld his consent to a sublease of the property.
After a nonjury trial, the trial court entered a judgment in favor of Waldrop, awarding him unpaid rent and prejudgment interest. There are no specific findings of fact contained in that judgment. In response to a postjudgment motion filed by Evans, the trial court entered an order vacating the judgment, but expressly declining to rule on Evans’s request for a new trial; in that same order, the trial judge recused himself from further proceedings in the matter, leaving the issue of whether to grant a new trial for the successor judge. Waldrop appealed, arguing that the trial court had erred in vacating the judgment and that the trial-court judge had erred in recusing himself. This court dismissed Waldrop’s appeal as having been taken from a nonfinal judgment. See Waldrop v. Evans, 181 So.3d 355 (Ala.Civ.App.2015).
After this court dismissed Waldrop’s appeal, the action was assigned to a successor trial-court judge, who entered a judgment stating that he had reviewed the trial transcript, the exhibits submitted during the trial, and the parties’ pleadings and legal memorandums. Based on a review of those materials, the trial court awarded Waldrop $36,000 in damages for unpaid rent. After the parties submitted post-judgment motions, the trial court entered an order amending its judgment in order to also award Waldrop prejudgment interest. Evans appealed.
There has been no argument that the successor trial-court judge erred in entering a judgment based on his review of the trial transcript and the evidence submitted during the trial, which had been presided over by the predecessor trial-court judge. See Rule 63, Ala. R. Civ. P. (governing further proceedings when “the judge is unable to proceed” and stating that, “[i]n a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed” (emphasis added)). See generally Kurtis A. Kemper, Annotation, Power of Successor or Substituted Judge, in Civil Case, to Render Decision or Enter Judgment on Testimony Heard by Predecessor, 84 A.L.R. 5th 399 (2000) (collecting cases in which courts have held that parties may consent to a successor judge’s rendering a decision based on evidence heard by a predecessor judge).[1]
Although the successor trial-court judge based his judgment on a review of the trial transcript and documentary evidence, Evans asserts in his appellant’s brief to this court that this appeal is from “a trial court’s judgment based on its assessment of disputed evidence and testimony.” Thus, he invites this court to apply the deferential ore tenus standard of review to *1069 the trial court’s determinations of fact.[2]
Precedent, however, indicates that, when an action is submitted on briefs, transcribed testimony, and documentary evidence, appellate courts typically do not apply the ore tenus rule. See Jackson v. Strickland, 808 So.2d 993, 995 (Ala.2001) (“[W]here ‘[t]he testimony was taken by depositions’ or was taken in a previous proceeding, ‘[t]here is ... no presumption of the correctness of the conclusion of the circuit court.’ ” (quoting Smith v. Cook, 220 Ala. 338, 341, 124 So. 898, 900 (1929))); and Hanks v. Spann, 33 So.3d 1234, 1237 (Ala.Civ.App.2009) (“Because Judge Carter reviewed the record of the bench trial conducted by Judge Aderholt and heard no oral testimony, the ore tenus rule does not apply to our review of the judgment he rendered.”). Regardless, however, of the applicable standard of review, we agree with the trial court’s judgment.

Discussion

Evans does not dispute that he stopped paying rent to Waldrop after May 2000, which was before the lease term expired. Rather, Evans argues that he cannot be held liable for breaching the lease agreement because, he asserts, Waldrop refused to allow Evans to sublease the property to a new tenant, who proposed to operate an “electronic-bingo parlor” on the property.[3] Although the lease agreement between Waldrop and Evans contained a provision prohibiting Evans from assigning the lease or subleasing the property without Wal-drop’s written consent, that provision also provided that Waldrop’s consent “may not be unreasonably withheld.” The trial court found that Waldrop’s refusal to consent to the sublease was reasonable.
In June 2000, after he stopped paying rent, Evans moved off of the property. Waldrop testified that, thereafter, he began searching for a new tenant; that he negotiated with multiple prospective tenants, including automotive-parts sellers and furniture dealers; but that he was unable to immediately re-lease the property.[4]
According to Waldrop, Evans telephoned him at some point and talked to him about the possibility of leasing the property to someone who wanted to operate an “arcade” on the property. Unbeknownst to Waldrop, Evans had recorded that conversation (as well as a subsequent conversation), and the recording revealed that Evans had informed Waldrop that Evans had been contacted by a person who wanted “to put a game room” on the property.
The recording indicates that, after Evans had mentioned the “game room,” Wal-drop stated that he did not want anything too “wild” on the property and that he did not want any “carrying on” on the property. He stated that, if the business was “up to par,” he would not object.
*1070 ■ Evans testified that the person he -had spoken to about a “game room” was Christine Miller’s husband. Miller testified that she had wanted to operate an electronic-bingo parlor on the property. She described the-business to the trial court as “an arcade where, you know, they have the machines, bingo machines and different ones. It’s adult machines, you know.” Miller testified further that she had- called Waldrop on the telephone, that she had “explained to him. exactly what kind of business it was to be,” that Waldrop had said “that was fine with him,” .and that Waldrop had “agreed to everything and ... knew exactly what [Miller] was going to do there.”
According to Miller, after she had spoken to Waldrop, she was under the impression that she would be allowed to sublease the property. Waldrop, on the other hand, testified that he did not know who Miller was and that he could not recall having had any conversations with her, Waldrop did not remember telling Miller that she could sublease the property. As Evans points out, the trial court found that “[t]he [proposed] sub-lease was contingent on [Waldrop’s] agreement which at first was given but quickly was revoked.” It is not clear whether, in making that finding, the trial court relied on Miller’s testimony or on the referenced recorded telephone conversation between Evans and Waldrop.
Miller also testified that she and Evans had signed a sublease. It appears that the testimony of Miller and Evans indicates that they executed the sublease after Miller’s alleged telephone conversation with Waldrop.- Miller also testified that she had borrowed funds, had opened a bank account, and had obtained a business license in preparation for opening the electronic-bingo parlor. Finally, Miller testified that she had given Evans a check in the amount of $2,400 for one month’s rent and a “security deposit.”
Evans testified that he had informed Waldrop that Miller had executed a sublease and that, “within probably two or three days,” Waldrop told Evans that “he had changed his mind.” One of the recorded telephone conversations between Waldrop and Evans indicates that Wal-drop’s other tenants had expressed disapproval of Miller’s operating her business on the property.
According to Evans, in response to Wal-drop’s having allegedly changed his mind, Evans stated that he would ask Miller if she “want[ed] to give up the lease.” Evans testified that, in response to that inquiry, Miller had “said she didn’t want to be [on the property] if it was going to cause a conflict,” that Evans had returned Miller’s security deposit, and that Miller had returned the keys to the property to Evans.
Consistent with Evans’s testimony, Miller testified that Evans had called her on the telephone and stated that ‘Waldrop had changed his mind and [that] he didn’t want that type of business in his building.” Miller also confirmed that Evans had returned her security deposit and that she had returned the keys to the property. She agreed that doing so “pretty much ... end[ed] the situation.”
Evans argues first that Waldrop could not “withhold” his consent to the sublease because, Evans asserts, Waldrop actually consented to the sublease but later “withdrew” that consent. We note initially that the original lease required Wal-drop’s consent to be expressed in writing, and -it is undisputed that Waldrop never provided a written document exhibiting his consent to. the sublease. - Evans does not expressly argue, in his appellant’s brief to this court, that Waldrop waived any rights he had under the lease by orally consenting to the sublease, and he does not point *1071 to any authority governing waiver. Although Evans makes a waiver argument in his reply brief, this court typically will not consider arguments made for the first time in a reply brief. Meigs v. Estate of Mobley, 134 So.3d 878, 889 n. 6 (Ala.Civ.App. 2013).
In any event, assuming Waldrop’s alleged oral consent was sufficient, the evidence clearly indicates that, after Waldrop “changed his mind," Evans and Miller rescinded the sublease they had executed. See L.B. Whitfield, III Family LLC v. Whitfield, 150 So.3d 171, 188 (Ala.2014) (indicating that parties to a contract may rescind their agreement by mutual consent). Evans addresses that rescission in his appellant’s brief to this court only by asserting that Waldrop “forced” Evans to rescind the sublease. The evidence, however, does not support the suggestion that Waldrop exercised undue pressure on Evans. Rather, the evidence indicates that Waldrop expressed that the other tenants were unhappy with Miller’s business being located on the property, that Evans responded that he would “ask [Miller if] she want[ed] to give up the lease,” and that Miller “said she didn’t want to be there if it was going to cause a conflict.” In addition, Evans does not point to any authority that would support his suggestion that the rescission of the sublease was somehow ineffective.
Thus, Mattox v. Wescott, 156 Ala. 492, 47 So. 170 (1908), upon which Evans relies in his reply brief, is distinguishable. In that case, our supreme court held that a landlord, by orally consenting to a sublease, had waived the right to consent in writing. There was no indication in Mat-tox, however, that the sublease, which had been executed in reliance on the landlord’s oral consent, was rescinded after the landlord purported to revoke that consent. Accordingly, we reject Evans’s argument that Waldrop’s alleged oral consent precluded him from later withholding that consent.[5]
Evans also argues that Wal-drop’s withholding of consent was unreasonable. It is the tenant’s burden to show that a landlord has acted unreasonably in refusing to consent to a sublease or to an assignment of a lease. Pantry, Inc. v. Mosley, 126 So.3d 152, 158 (Ala.2013). “The reasonableness of a landlord’s failure to consent to [a sublease or] an assignment of a lease is judged in accordance with a commercial-reasonableness standard.” Id. (citing Rowley v. City of Mobile, 676 So.2d 316, 318 (Ala.Civ.App.1995), and Homa-Goff Interiors, Inc. v. Cowden, 350 So.2d 1035, 1038 (Ala.1977)).
“‘Among the legitimate factors landlords may consider in assessing reasonableness [are]: the financial responsibility of the proposed assignee or subtenant, whether the new tenant’s use will require alteration of the premises, the legality of the proposed use, the nature of the occupancy, and the compatibility of the tenant’s use with the uses of the other tenants in the same shopping center or office building. Courts have held it improper for a landlord to reject an assignee or sublessee on considerations of personal taste, sensibility or convenience.’ ”
Rowley v. City of Mobile, 676 So.2d at 319 (quoting 12 D. Thomas, Thompson on Real Property § 97.06(c)(22)(iii) at 108 (1994)). According to our supreme court, whether a landlord has acted reasonably is a question *1072 of fact for the trier of fact. Homa-Goff Interiors, Inc. v. Cowden, 350 So.2d at 1038.
“[A] landlord does not unreasonably withhold consent to an assignment unless the landlord is presented with — and rejects — a prospective assignee who ... meets commercially reasonable standards.” Rowley, 676 So.2d at 319.
“A tenant has the burden of furnishing sufficient information about the proposed assignee to enable the landlord to determine whether it will consent to an assignment. D’Oca v. Delfakis, 130 Ariz. 470, 636 P.2d 1252 (Ariz.App.1981).
“ ‘The lessor is under no duty to seek out such information. In the absence of information concerning the proposed tenancy and the tenant, the lessor is justified in withholding consent.’
“D’Oca v. Delfakis, 130 Ariz. at 472, 636 P.2d at 1254.”
Rowley, 676 So.2d at 320.
Consistent with the above-stated principles, the trial court in the present case found that any suggestion that Miller’s business “would have been successful ... is all based on speculation,” noting that, for all that appeared from the evidence, it would have been Miller’s first attempt at operating any business, including an electronic-bingo parlor. The trial court determined that Miller’s testimony was not sufficient by itself to establish “that the bingo business was financially solvent” and likely to succeed.
Evans argues that he “was not required to prove that [Miller’s] business would have been an actual success.” He asserts that he was required to show only that Miller met the commercial-reasonableness standard. This court, however, is not convinced that the likelihood of a proposed new tenant’s success is not a legitimate concern under the commercial-reasonableness standard. See Gary L. Hall, Annotation, Construction and Effect of Provision in Lease that Consent to Subletting or Assignment Will Not Be Arbitrarily or Unreasonably Withheld, 54 A.L.R.3d 679, § 2[a] (1973) (“[T]he courts appear to have recognized that a key factor in determining whether a landlord’s refusal is unreasonable is whether the landlord may be assured that the covenants of the lease, particularly the covenant to pay rent, will be met.”).
Evans also suggests that the evidence actually did show that Miller’s business was likely to succeed. In support of his assertion, he points to the fact that Miller was able to open a bank account, to obtain a business license, to borrow funds, and to pay the first month’s rent and a security deposit. He also relies on Miller’s testimony that her business would need a “big parking lot” and Waldrop’s alleged initial consent to the sublease. Simply put, this court disagrees that those circumstances established a likelihood of Miller’s success.
Evans also asserts that there was no evidence presented indicating that Wal-drop had refused to consent to the sublease because of any concerns he had with Miller’s business acumen. As noted, Wal-drop testified that Evans had told him that Miller wanted to operate an “arcade,” and a recorded telephone conversation indicated that Evans had referred to the proposed business as a “game room.” According to Waldrop, “[i]t was never explained to [him] what [the arcade or game room] would have been,” and he stated that he did not “know whether that was intended to be bingo or what the arcade would have been.” He also testified that he was never given any written materials regarding the business. Thus, there was at least some evidence presented tending to support a conclusion that Waldrop did not have sufficient information upon which *1073 to judge the likelihood of Miller’s business succeeding.
Regardless, Waldrop also testified that he believed that he had a duty to protect the interests of the other tenants in the shopping center and that, although he was not certain, he most likely had made a decision that Miller’s business could adversely affect their interests. He testified that he “would not have been happy with a sublease to an arcade” and that “[njeither would the current tenants have been happy with an arcade sublease.” As noted, one of the recorded telephone conversations indicates that Waldrop’s other tenants had expressed their displeasure with Miller’s business. The nature of the new tenant’s proposed occupancy and the compatibility of the new tenant’s proposed use with that of the other tenants are legitimate concerns. Rowley, 676 So.2d at 319. This court may affirm the trial court’s judgment for any legitimate reason supported by the record. DWOC, LLC v. TRX All., Inc., 156 So.3d 978, 983 (Ala.Civ. App.2014). We conclude that Waldrop did not act unreasonably in refusing to consent to Miller’s subleasing the property based on the objections of Waldrop’s other tenants.[6]
Finally, we note that Evans asserts in the statement-of-facts section of his appellant’s brief that he also found “an established restaurant that wanted to lease the property.” One of the recorded telephone conversations between Evans and Waldrop shows that Evans claimed to have known of “a restaurant guy,” who operated a restaurant called “Victoria’s,” that was interested in the property. Waldrop responded that he would “rather not” have a restaurant on the property because it would conflict with the interests of another tenant that was already operating a restaurant in the shopping center. In the argument section of his brief, Evans does not expound upon his suggestion that it was unreasonable for Waldrop to refuse to consent to a sublease to the restaurant operator. See Rule 28(a)(10), Ala. R.App. P. (setting forth the requirements of the argument section of an appellant’s brief). In any event, we note that there is not much information in the record regarding the restaurant. No representative of the restaurant owner testified, and there was no other evidence indicating that the restaurant owner was ready and willing to lease the property, other than Evans’s claim that he had been interested in leasing the property. Moreover, Evans also agreed during the trial that the restaurant in question was similar to the restaurant that was already located in the shopping center. Thus, we conclude that Evans has not met his burden of showing that Wal-drop acted unreasonably in allegedly with *1074 holding consent to a sublease to the restaurant operator.
Based on the foregoing, the trial court’s judgment is due to be affirmed.[7]
AFFIRMED.
THOMPSON, P.J., and'THOMAS, MOORE, and DONALDSON, JJ., concur.

. Our supreme court in Alabama Power Co. v. Wallace, 548 So.2d 1372, 1375 (Ala. 1989), suggested that a previous version of Rule 63 did not authorize a successor judge to rule on the credibility of witnesses whose testimony he or she did not hear. That version of Rule 63, however, has since been amended, and, in any event, the supreme court did not hold in Wallace that parties could not stipulate to such a procedure or that an appellate court should, without argument from the appellant, consider the issue sua sponte.

. This court recognizes that Evans’s strategy in asking this court to apply the ore tenus standard of review is based on his position that the trial court made a factual determination that, Evans asserts, is favorable to his position.

. The parties’ arguments are somewhat ambiguous as to whether the proposed sublease was to be a true sublease or was, rather, a proposed assignment of Evans’s interest in the property. That distinction, however, is not material to the issues addressed by this opinion. For the sake of simplicity, we will refer to the proposed agreement as a sublease.

.There has been no argument that Waldrop accepted Evans’s abandonment of the property during any of the period for which Waldrop has sought unpaid rent. Waldrop eventually was able to re-lease the property to a new tenant, and he has not claimed unpaid rent for any time thereafter.

. We also reject Evans’s suggestion that a binding contract existed between Waldrop and Miller that precluded Waldrop from withholding consent to Miller’s sublease of the property. It is undisputed that Waldrop never signed the sublease. In any event, it is clear that Miller agreed to a rescission of any such agreement.

. Although Evans asserts that Waldrop’s other tenants objected to Miller’s business based on their own personal tastes or sensibilities, he does not point to any evidence that supports that assertion, other than Waldrop’s testimony, which was stricken upon motion by Evans’s counsel, that one of Waldrop's other tenants, a church, had thanked him for not allowing Miller to sublease the property. We note that there was also some evidence presented suggesting that Miller’s business might require the use of an unusually large amount of parking spaces and that Waldrop responded “I have no idea" when asked by Evans's counsel whether Miller’s proposed electronic-bingo parlor would have been legal. See generally Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65, 86 (Ala.2009) (indicating that certain types of electronic "bingo” machines were not permitted under a local constitutional amendment allowing the game of "bingo"). Finally, we also note that, although Rowley indicates that a landlord may not withhold consent to a sublease based solely on his or her personal tastes or sensibilities, Evans does not point to any authority indicating that a landlord cannot properly take into consideration his other tenants' objections to a proposed sublease based on their tastes or sensibilities.

. Our holding obviates the need to consider whether Evans’s breach of duty to pay rent, which undisputedly occurred before Waldrop refused to consent to a sublease with Miller, relieved Waldrop of any duty he had to consider subleasing the property. See generally Ryals v. Laney, 338 So.2d 413, 415 (Ala.Civ. App.1976) ("We need not decide the effect on an award of damages to a lessor occasioned by his alleged refusal to sublet to a responsible individual when-the evidence discloses no such refusal. However, we do note that when the tenant abandons the leased premises prior to the expiration of the term agreed upon in the lease, ‘it is the option of the lessor to allow the premises to remain vacant and re- ■ cover rent for the whole term, or to put an end . to the lease by re-entry.’ ” (quoting McClure v. Daniel, 45 Ala.App. 558, 562, 233 So.2d 500, 502 (1970))).