THOMPSON, Presiding Judge.
Luvena K. Meigs appeals from the judgment entered by the Mobile Circuit Court (“the trial court”) in favor of the estate of Madge B. Mobley, deceased (“the estate”), determining that Meigs owed the estate $30,203. The dispute in this case involves an oral loan agreement between an elderly family member, Mobley, and her granddaughter-in-law, Meigs.
In May 2010, the estate filed a complaint against Meigs in the trial court alleging, among other things, that on May 4, 2004, Mobley loaned Meigs $50,000 and Meigs promised to pay Mobley $750 per month *880 until the principal amount, plus interest, was paid in full. The estate sought payment of the alleged debt based on claims of breach of contract, “account stated,” and “money lent.” Meigs answered, denying the material allegations in the complaint and raising numerous affirmative defenses. Meigs later filed additional pleadings and motions acknowledging the existence of the debt but maintaining that Mobley had made the loan to Allure Studio, Inc., an Alabama corporation of which Meigs is the sole shareholder, and not to Meigs in her individual capacity.[1]
On April 4, 2012, the trial court held a hearing at which it received conflicting ore tenus and documentary evidence; a copy of the transcript of that hearing is included in the record on appeal. Both parties filed post-hearing briefs. On May 29, 2012, the trial court entered a judgment in favor of the estate in the amount of $30,203.
On June 27, 2012, Meigs filed a motion titled “motion for a new trial or to alter, amend, or vacate.” On July 13, 2012, the trial court held a hearing on Meigs’s post-judgment motion; the record on appeal does not include a copy of the transcript of that hearing. On July 17, 2012, the estate filed a response to Meigs’s postjudgment motion. On July 18, 2012, Meigs filed another motion titled “supplemental motion to alter, amend, or vacate.” On July 20, 2012, Meigs filed a letter brief. On July 25, 2012, the trial court entered an order denying Meigs’s “motion to vacate or modify.” Meigs timely appealed on August 28, 2012.
The evidence presented at the April 4, 2012, hearing reveals the following facts.’ Mobley died on June 17, 2007, at the age of 87. At the time Mobley died, she lived in Franklin, North Carolina. At the time of her death, Mobley was Meigs’s grandmother-in-law. Meigs was married to Mobley’s grandson, James Meigs, from 1991 until they divorced in February 2009.
Mobley was survived by her twin daughters, Dale Cobb and Gale Meigs; at the time of the hearing, they were 73 years old. Dale is the personal representative of the estate. Gale is James’s mother.
During their marriage and at the time of the hearing, Meigs and James lived in the Mobile area. Gale and Dale previously lived in the Mobile area, but at some point before 2004 they moved to North Carolina. At the time Mobley died, both Gale and Dale lived in North Carolina. At the time of the hearing, at least Dale continued to live there.
Meigs is a licensed manicurist. In early 2004, Meigs was working and “renting space” at a salon in the Mobile area. Also, *881 in early 2004, the salon owners lost their salon space and decided to close, so Meigs decided to open her own salon. Meigs found a salon nearby where the salon owner, who wanted to retire, was looking for someone to assume the lease for her salon space. Apparently, Meigs reached an agreement with that salon owner to take over the lease of her salon space. Meigs decided to name her salon “Allure Studio.”
Meigs discussed her desire to open her own salon with James. Meigs contacted the Mobile Area Chamber of Commerce, and the Chamber helped her develop a business plan. The cover page for the business plan, dated March 22, 2004, reads “Allure Studio” and “Owner: Luvena Meigs.” The business plan estimated start-up costs of $65,595.94. The Chamber also set up appointments with three banks in Mobile for Meigs to apply for a loan for the start-up costs. Meigs applied for a loan with all three banks, but by approximately mid to late April 2004 all of them had denied Meigs’s request for a loan.
Meigs and James discussed other options, and the evidence indicates that in late April 2004 James, and possibly Meigs, discussed with Gale the possibility of Mob-ley’s loaning Meigs the money. Although the evidence as to that initial conversation is conflicting, the initial conversation occurred between either Gale and James or Gale, James, and Meigs. Gale testified that if James and Meigs had wanted money from Mobley, “they would come through me.” Within a few days of that initial conversation, Gale told Meigs that she had talked to Mobley and that Dale and Mobley “were going to the bank to see what they could do.” Shortly thereafter, Gale told Meigs that Mobley could loan $50,000. At that time, Mobley was 84 years old.
Mobley intended to obtain the money for the loan from Macon Bank in North Carolina by placing an “equity line of credit deed of trust” on her home. On April 30, 2004, Mobley established the equity line in the amount of $50,000 at Macon Bank. On May 5, 2004, the deed reflecting the equity line was filed in the Register of Deeds in Macon County, North Carolina. All documentation regarding the establishment of the equity line bears Mobley’s signature.
It is undisputed that Mobley loaned Meigs the money by oral agreement. Although the estate and Meigs dispute whether Mobley made the loan to Meigs in her individual capacity or to Allure Studio, Inc., the following facts regarding the loan are undisputed. Payments were due each month in the amount of $750 until the loan amount, plus interest, was paid in full. The interest rate would mirror the interest rate on Mobley’s equity loan at Macon Bank — i.e., it would be a variable interest rate of prime plus 1%, with a floor of 5%.
On April 26, 2004, Meigs opened a bank account for Allure Studio at Regions Bank in Mobile; the owner of that account was listed as “Luvena Kay Meigs dba Allure Studio Inc.” However, the business name on the checks for that account has always been “Allure Studio, Inc.” On April 27, 2004, Meigs deposited a $3,000 cheek from Mobley into the Allure Studio bank account. The record does not contain a copy of that check, and the record is silent as to whether Mobley made that check payable to Meigs or to Allure Studio. On April 29, 2004, Meigs, via a check from the Allure Studio bank account, made a payment in the approximate amount of $1,800 to the property manager for her salon space. Meigs testified that she had needed the loan proceeds “quickly” to make that payment.
On May 5, 2004, Mobley wired $46,838 from Macon Bank in North Carolina to the Allure Studio bank account at Regions Bank in Mobile. The outgoing wire-trans *882 fer receipt- reflects the originator as “Madge B. Mobley” and the name on the beneficiary account as “Luvena K. Meigs”; the beneficiary-account number matches the Allure Studio bank account. The outgoing wire-transfer receipt bears Mobley’s signature. The incoming wire-transfer receipt reflects the sender as “Madge B. Mobley” and the name on the beneficiary account as “Luvena Kay Meigs”; the beneficiary-account number matches the Allure Studio bank account. At the top of the incoming wire-transfer receipt, the name “Luvena Kay Meigs dba Allure Studio Inc.” appears.
Two days later, on May 7, 2004, Allure Studio, Inc., filed articles of incorporation in the Mobile Probate Court. The record does not contain any other documentation regarding the incorporation of Allure Studio, Inc. The articles of incorporation identify Meigs and James as directors of the corporation and Meigs as incorporator.
All of the $50,000 loan proceeds were used for start-up costs for Allure Studio.[2] All payments on the loan have been made on checks from the Allure Studio bank account bearing the business name “Allure Studio, Inc.” on the face of the checks.
To pay the debt, Meigs agreed to deposit $750 per month into Gale’s account at Regions Bank, and Gale in turn would use those funds to make monthly payments to Macon Bank on Mobley’s equity loan. We note that the first five payments were paid directly to Macon Bank and the sixth payment was paid to Dale, but, thereafter, the payments were made to Gale in the manner described above. Gale provided Meigs with copies of the Macon Bank statements verifying that the funds she received from the payments to her from Meigs were used to pay down Mobley’s equity loan.
In December 2004, less than eight months after the loan was made,, Meigs and James filed for Chapter 13 bankruptcy; they were discharged from bankruptcy more than six years later, in April 2012. There is no evidence indicating that Mob-ley had had any knowledge that Meigs and James had filed for Chapter 13 bankruptcy. The evidence was unclear, at best, as to whether and when Gale and/or Dale, obtained knowledge of the bankruptcy filing.
Meigs and James did not list the loan at issue as a personal debt in their bankruptcy filings. Nonetheless, James testified at the hearing in this case that he considered the loan to be a “loan to help start the business,” “a loan to us to help start the business.” He then clarified that he considered the loan to have been made to Meigs' in her individual capacity.
Dale and Gale also testified that Mobley had made the loan to Meigs and not to Allure Studio, Inc. Dale testified that Mob-ley had told her that she had made the loan to Meigs in her individual capacity. Gale testified- the Mobley had made the loan to Meigs in her individual capacity and that, at the time the loan was made, Mobley did not know of any corporation that Meigs had intended to form.
Meigs, on the other hand, testified that the loan was made to “Allure Studio, Inc.” Meigs testified that there were never any discussions that it was a loan to her in her individual capacity. Meigs testified that if she had considered the loan to have been made to her in her individual capacity, she would have included it in the bankruptcy filings.
Tony Zick, the accountant for Allure Studio, Inc., testified that the loan has always been treated as a loan to Allure *883 Studio, Inc. A copy of 2004 federal income-tax return for Allure Studio, Inc., which was prepared by Zick and admitted into evidence, reflects that the loan was being treated as a loan to the corporation. Zick testified that if the trial court ruled that the loan was a personal debt, the interest on the loan could not be treated as a business expense, which would cost the business thousands of dollars in lost deductions.
The evidence indicates that the loan-payment arrangement went smoothly until early 2008, about the time Meigs and James’s divorce proceedings began. Meigs testified that she stopped receiving payment-verification documentation in January or February 2008. Although Gale testified that she had given Meigs all the information she had requested, the evidence indicates that Meigs had problems receiving copies of the Macon Bank statements beginning in 2008 and continuing thereafter.
On June 19, 2008, unbeknownst to Meigs, Dale “refinanced” the equity loan; Dale and Gale had inherited Mobley’s home when she died in June 2007. Dale testified that she never discussed the equity loan or the refinancing with Meigs. Gale testified that she did not tell Meigs about the refinancing of the equity loan because she did not want Meigs to “know my business.” As part of the refinancing, Dale paid off the outstanding balance on the original equity loan — $36,890.85—and obtained a new equity line in the amount of $110,000. The interest rate on the new equity line was a fixed rate of 7.5%. During her testimony, Dale maintained that, after the refinancing, the interest rate on the loan Meigs owed the estate was changed to a fixed rate of 7.5%. Dale testified that the interest-rate change “wasn’t really based on [the new loan]. She had a variable rate and I just picked a happy medium is what I did.”
The evidence indicates that in 2009 Meigs expressed to Gale that the business was having difficulty because of the downturn in the economy. In June 2009, Dale and Gale offered to accept monthly payments in the amount of $500 if Meigs was unable to pay in accordance with the original agreement. Gale noted on an amortization schedule, which was introduced into evidence: “$750 original agreement” and “when house sold you can drop to $500,” but “you can drop to $500 now if that will help you out.” In a letter dated November 16, 2009, from Dale and Gale to Meigs, which was also introduced into evidence, Dale and Gale stated, in part:
“We have proof that [Macon] Bank wired you the money along with letters that you sent thanking [Mobley] for the [l]oan, [and] also stating that you would send $750 or more a month until paid off. However, we have offered for you to pay only $500 (in June 2009) a month, if you were unable to pay the original agreement.
[[Image here]]
“The [a]mount [p]ast [d]ue @ $500 a month totals $2,500. We will not hold you to the agreed amount of $750 a month, if you will send the past due and continue at $500 a month.”
The evidence also indicates that in 2009 Meigs considered selling the salon and that, according to Meigs, she had difficulty obtaining loan-balance and payment-verification documentation from Gale. Gale testified that she gave Meigs all the information that she requested. Gale testified that when Meigs stopped making the monthly payments on the loan, they had a conversation about the matter and Meigs told her “she didn’t want to talk about it” and “she didn’t have the money.” Meigs testified that she ultimately stopped paying on the *884 loan based on advice of counsel “until [she] had some proof of where [her] money was going.”
According to Dale, following the refinancing, Meigs made payments totaling $9,375 through July 8, 2009. During the hearing, counsel for the estate explained that, for the sake of simplicity, the estate had credited all those payments to the principal balance without charging interest for the period of June 18, 2008, through July 8, 2009, thus reducing the loan balance to $27,515.85. According to Dale, from July 8, 2009, up until the date of the hearing, Meigs had made four additional payments in the amount of $250 each, beginning in October 2011. According to Meigs, from July 8, 2009, up until the date of the hearing, she had made approximately eight payments in the amount of $250 each, beginning in July 2009.
At the close of the hearing, the trial court, among other observations, noted on the record that, if it determined the debt was an individual debt, a further determination would have to be made as to how to calculate prejudgment interest. The trial court noted that this type of case was full of problems:
“[T]his is just an absolute demonstration of the impossibility of trying to make sense out of deals where people borrow $50,000 over the telephone. They don’t have any memorandum. They don’t have any ... how do you ... where is the meeting of the minds? What about acceleration? What about interest for pre-payment, all that stuff that goes into those — We have nothing there. So, I don’t know how in the world you sit down and start calculating interest rates — I’m sure the concept at some point in time was [Mobley] would go borrow against her house and [Meigs] would pay off the debt. That’s probably what they did.”
The trial court invited the parties to file short, “two-page summary” post-hearing briefs as to “what am I to look at” relating to the central issue of whether Mobley made the loan to Meigs in her individual capacity or to Allure Studio, Inc.
Both parties filed post-hearing briefs. In its post-hearing brief, the estate maintained that Mobley had made the loan to Meigs in her individual capacity. The estate set forth its proposal for determining the loan balance and maintained that the applicable rate of interest on the outstanding balance should be the 6% rate prescribed by § 8-8-1, Ala.Code 1975. The estate also filed a supplemental brief that states:
“You asked that I do the interest calculation on the judgment to be entered against Meigs. Please recall that on July 8th, 2009 when Meigs initially stopped making payments the balance was $27,515, as benchmarked in trial. The interest rate you have chosen to apply is the six (6%) percent statutory interest rate. From July 8, 2009 until October 1, 2011 (when Meigs made her next payment of $250) 846 days elapsed. Six (6%) percent interest on $27,515 per annum is $1,591 per year or $4.36 per day. $4.36 x 846 days equals $3,688 of interest accrued until October 1, 2011. I suggest that we take the $27,515 amount from July 8, 2009 and add $3,688 to that. This would bring the total due to $31,203. Then, to simplify the interest calculations, I propose that we subtract Meigs’ four (4) $250 payments totaling $1,000 directly from the $31,203 sum. This leaves a balance of $30,203. I request that you enter a judgment against Meigs in the amount of $30,203. It will bear interest at the judgment rate until paid by her. I hope this is in accordance with your thinking and fairly simple to understand. I have given Meigs *885 the better deal on all points. If you need anything further to enter a, judgment please let me know.”
In her post-hearing brief, Meigs maintained that Mobley had made the loan to Allure Studio, Inc., and not to Meigs in her individual capacity. Meigs also maintained that if the trial court determined that Mobley had made the loan to her in her individual capacity, the oral contract did not contain an acceleration clause, and, thus, she argued, the amount owed should be limited to the accrued monthly payments at the time of the judgment and not the full amount of the debt owed. Meigs maintained that the estate agreed to lower the monthly payments to $500 per month in 2009. Meigs also argued that the trial court should calculate interest based on the interest rate the parties agreed to at the time the loan was made and not the 6% rate prescribed by § 8-8-1. Meigs finally argued that the estate had failed to give her credit for eight specified payments she claimed to have made after July 8, 2009.
On May 29, 2012, the trial court entered a judgment in favor of the estate in the amount of $80,203. On June 27, 2012, Meigs filed a motion titled “motion for a new trial or to alter, amend, or vacate.” In that motion, Meigs essentially addressed the same issues and made the same arguments contained in her post-hearing brief. We note, however, that, as to her interest-rate-calculation argument; Meigs made the same argument contained in her post-hearing brief but also inconsistently argued that, “[although the Order does not contain an interest rate determination, to the extent the Court applied an interest rate other than the statutory rate stated in § 8-8-1, [Meigs] submits this Court should amend and apply the correct rate.”
■ On July 13, 2012, the trial court held a hearing on Meigs’s postjudgment motion; the record on appeal does not contain a copy of the transcript of that hearing. On July 18, 2012, Meigs filed another motion titled “supplemental motion to alter, amend, or vacate.” In-that motion, Meigs essentially addressed the same issues contained in her initial postjudgment motion. As to her interest-rate-calculation argument, Meigs changed her position and argued for the first time that the .oral contract contained a usurious rate of interest from January 2005 forward, and, thus, she maintained, according to § 8-8-1, the amount owed should be reduced to reflect no interest due for the period when a usurious rate applied. On July 25, 2012, the trial court entered an order denying Meigs’s “motion to vacate or modify.” Meigs timely appealed.
At the outset, we note the applicable standard of review. In Whorton v. Bruce, 17 So.3d 661, 664-65 (Ala.Civ.App.2009), this court set out the applicable standard of review:
“As to our standard of review in such a case, this court has written:
“ “When ore tenus evidence is presented, a presumption of correctness exists as to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. J & M Bail Bonding Co. v. Hayes, 748 So.2d 198 (Ala.1999); Gaston v. Ames, 514 So.2d 877 (Ala.1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court “will assume that the trial judge made those findings necessary to support the' judgment.” Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992). Moreover, “[u]nder the ore tenus rule, the trial *886 court’s judgment and all implicit findings necessary to support it carry a presumption of correctness.” Transamerica, 608 So.2d at 378. However, when the trial court improperly applies the law to facts, no presumption of correctness exists as to the trial court’s judgment. Allstate Ins. Co. v. Skelton, 675 So.2d 877 (Ala.1996); Marvin’s, Inc. v. Robertson, 608 So.2d 391 (Ala.1992); Gaston, 514 So.2d at 878; Smith v. Style Advertising, Inc., 470 So.2d 1194 (Ala.1985); League v. McDonald, 355 So.2d 695 (Ala.1978). “Questions of law are not subject to the ore tenus standard of review.” Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court’s conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So.2d 576, 577 (Ala.1993). This court reviews the application of law to facts de novo. Allstate, 675 So.2d at 379 (“[Wjhere the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court’s judgment carries no presumption of correctness.”).’
“City of Prattville v. Post, 831 So.2d 622, 627-28 (Ala.Civ.App.2002).”
On appeal, Meigs first contends that the trial court erred in finding that the debt was her individual debt instead of the corporate debt of Allure Studio, Inc. Meigs concedes in her brief on appeal that this issue — i.e., the propriety of the trial court’s implicit finding of fact that Mobley made the loan to Meigs in her individual capacity and not to Allure Studio, Inc. — is reviewed under the ore tenus standard set out above.
Meigs cites Brown v. W.P. Media, Inc., 17 So.3d 1167 (Ala.2009), and City of Orange Beach v. Perdido Pass Developers, Inc., 631 So.2d 850 (Ala.1993), for the proposition that a party can enter into an agreement with a corporation not yet formed, and, through course of dealings, that party subsequently may be estopped from denying the corporate existence. Although Meigs cites Brown and City of Orange Beach for a legitimate proposition of law, those cases are factually distinguishable from, and are not controlling legal authority for, the case before us. Without going into a detailed analysis of those cases, we note that both of those cases involved parties dealing at arm’s length in a business environment.
In the case before us, we have an 84-year-old grandmother (i.e., Mobley) who agreed to obtain an equity loan on her home in the amount of $50,000 in order to loan a family member (i.e., Meigs) money to start a business. It is undisputed that Allure Studio, Inc., was not yet incorporated when the loan was made, and the record contains evidence from which the trial court reasonably could have found that neither Mobley, nor Gale, nor Dale knew that Meigs intended to form a corporation at the time the loan was made. The record contains scant direct evidence of exactly to whom or to what entity Mob-ley intended to loan the $50,000. The only documentary evidence as to this matter is the outgoing wire-transfer receipt, dated May 5, 2004, and signed by Mobley; that outgoing wire-transfer receipt reflects the originator of the transfer as “Madge B. Mobley” and the name on the beneficiary account as “Luvena K. Meigs.” There is no indication on the outgoing wire-transfer receipt that the money was wired to a corporate or business account. Similarly, the incoming wire-transfer receipt reflects the sender as “Madge B. Mobley” and the beneficiary as “Luvena Kay Meigs.” The fact that all payments were made by *887 checks bearing the name “Allure Studio, Inc.” does not require the trial court to find that Mobley made the loan to Allure Studio, Inc., and not to Meigs in her individual capacity. Based on the presumption of correctness afforded the trial court’s factual determinations under the ore tenus standard, we cannot say that the trial court erred in finding that Mobley made the loan to Meigs in her individual capacity. Accordingly, the trial court’s judgment as to this issue is affirmed.
Next, Meigs contends that the trial court erred in applying a 6% interest rate to the amount owed.[3] Meigs maintains that, pursuant to §§ 8-8-1 and § 8-8-12(b), Ala.Code 1975, and Patterson v. Green, 474 So.2d 725 (Ala.Civ.App.1985), any interest rate charged by Mobley or the estate above 6% were usurious and, therefore, no interest should be charged for the applicable period.[4]
Meigs, however, first raised this argument in her motion titled “supplemental motion to alter, amend, or vacate,” filed more than 30 days after the judgment it references.. In her motion, Meigs sought to change her position and argument on the interest-rate-ealculation issue and for the first time argued that, pursuant to the oral contract, a usurious rate of interest applied from January 2005 forward and, thus, that the amount owed should be reduced to reflect no interest due for the period when a usurious rate applied.
We conclude that Meigs raised this argument too late. Meigs first attempted to raise this argument in her second post-judgment motion. That motion was not timely filed within 30 days from the date the judgment it references was entered and thus failed to invoke the jurisdiction of the trial court. See Kimbrell v. Kimbrell, 965 So.2d 789, 793 n. 6 (Ala.Civ.App.2007) (a motion to alter, amend, or vacate, pursuant to Rule 59, Ala. R. Civ. P., must be filed within 30 days of the judgment it references to invoke the jurisdiction of the trial court). In addition, a trial court is not required to consider a new legal argument in a party’s postjudgment motion. “ ‘ “[A] trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so.” ’ ” Espinoza v. Rudolph, 46 So.3d 403, 416 (Ala.2010) (quoting Special Assets, L.L.C. v. Chase Home Fin., L.L.C., 991 So.2d 668, 678 (Ala.2007), quoting in turn Green Tree Acceptance, Inc. v. Blalock, 525 So.2d 1366, 1369 (Ala.1988)). Based on the foregoing legal authority, Meigs *888 failed to raise this argument in a timely manner, and we will not address it further. Accordingly, the trial court’s judgment as to the calculation of interest is affirmed.[5]
Next, Meigs contends that the oral contract did not contain an acceleration clause and that, in the absence of an acceleration clause, the trial court should have limited the judgment to the monthly payments that had accrued at the time the judgment was entered. Meigs cites Rosenfeld, v. City Paper Co., 527 So.2d 704, 705 (Ala.1988), for the proposition that acceleration of unaccrued payments is not to be read into payment contracts by implication.
In Rosenfeld, the parties entered into a written agreement for the payment of money that did not contain an acceleration clause. In Rosenfeld, the pertinent language of the promissory note at issue read:
“‘In the event that the relationship between [Rosenfeld/payor] and [City Paper Company/payee] terminates, regardless of the reason for such termination, the outstanding balance then due on the obligation expressed herein shall be due and payable, without interest, in five (5) equal annual installments, beginning one year from the date of the termination of the relationship of the parties.’ ”
527 So.2d at 704-05.
Apparently, Rosenfeld breached the agreement. Among other issues, the trial court entered a summary judgment in favor City Paper Company based on the full amount of the note, even though only two of the five installments had become due at the time of the entry of the judgment. Our supreme court reversed the judgment as to this issue and remanded the case with instructions to the trial court to enter the judgment based on the sum of two accrued annual installments. 527 So.2d at 704. In so doing, our supreme court rejected the application of “anticipatory breach” to unilateral contracts for the payment of money only. Id. at 705.
In analyzing the issue, our supreme court reasoned, in part:
“City Paper Company agrees that the note contains no acceleration clause, and that the case law, generally speaking, supports Rosenfeld’s contention that ‘acceleration of the maturity of unaccrued payments’ is not to be read into payment contracts by implication. For a collection of the cases so holding, see 10 C.J.S., Bills & Notes § 529 at 1160 (1938)....
[[Image here]]
“.... ‘Anticipatory breach’ has a field of operation where the nondefaulting parties remain liable for certain obligations under a bilateral contract. To require the nondefaulting party to continue the discharge of his contractual duties, in face of a clear, unequivocal repudiation of the contract by the defaulting party, is a senseless requirement that unduly penalizes the nonde-faulting party.
“The majority of jurisdictions faced with this issue have drawn the distinction and have not allowed the ‘anticipatory breach’ doctrine to apply to unilateral contracts, particularly for the payment of money only. The ‘settled’ rule was succinctly expressed by Justice Cardozo in Smyth v. United States, 302 U.S. 329 at 356, 58 S.Ct. 248 at 253 (1937):
“ ‘[T]he doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money only.’
*889 “Some of the cases cited above reference Professor Williston’s treatise for the rationale that rejects the application of the ‘anticipatory breach’ doctrine to installment contracts that contain no acceleration clause: ‘[Allowing the prom-issee immediate recovery is nothing but a direct bonus to the promissee beyond what he was promised and a direct penalty to the promissor.’ See, for example, Mabery v. Western Casualty & Surety Co., 173 Kan. 586, 250 P.2d 824, 828-29 (1952), citing 5 Williston on Contracts § 1328 (rev. ed.1937).
“Indeed, the use of the ‘acceleration of maturity of payment’ clause is in recognition of the nonapplicability of the anticipatory breach doctrine in installment payment contracts. Once the promissee has done all there is for him to do under the contract and the promissor’s obligation is confined to payment by installments as specified by the contract, the doctrine of anticipatory breach has no field of operation and will not intercede to rescue the promissee from the consequences of the absence of an acceleration clause.
“While City Paper Company’s ‘judicial econom/ argument has its appeal, the right of the parties to the protection of the rule of law cannot be sacrificed on the altar of judicial efficiency.”
Rosenfeld, 527 So.2d at 705-06 (footnote omitted).
We recognize that Rosenfeld involved a written unilateral agreement for the payment of money, and the case before us involves an oral unilateral agreement for the payment of money. However, we have found no Alabama cases involving the issue whether acceleration of payments can be read into an oral unilateral agreement for the payment of money. Logically, and in fairness, the requirement that a borrower must specifically agree to the acceleration of payments in such a written agreement should apply to a borrower under an oral agreement. Therefore, we hold that the trial court erred in reading the acceleration of payments into the oral agreement before us. Accordingly, we reverse the judgment as to this issue. On remand, the trial court should determine the amount owed based on the accrued payments as of the date of the judgment and not the full amount of the outstanding loan balance.[6]
Finally, Meigs contends that the trial court failed to credit her for certain *890 payments she claims to have made after July 8, 2009. Specifically, Meigs contends that the estate’s Exhibit 8, which was admitted into evidence, failed to credit her for eight payments totaling $2,000, as reflected in her Exhibit 22, which also was admitted into evidence.
The estate’s Exhibit 8 reflects, and the record indicates the trial court found, that as of July 8, 2009, the outstanding loan balance totaled $27,515. Based on the estate’s calculations, the trial court, in arriving at the amount owed, credited Meigs for four $250 payments totaling $1,000 after July 8, 2009. The estate maintains, per Dale’s testimony and its post-hearing brief, that Meigs made four $250 payments following July 8, 2009; the dates of those payments were not specified, except to say that Meigs began making those payments in October 2011. The record is clear that the trial court entered the judgment based on the estate’s calculations. See the estate’s second post-hearing brief, quoted supra.
Meigs directs us to the following checks listed in her Exhibit 22:
July 17, 2009 Check 4105 $250
July 24, 2009 Check 4114 $250
October 1, 2011 Cheek 2450 $250
November 25, 2011 Check 2562 $250
December 20, 2011 Check 3071 $250
January 19, 2012 Cheek 3070 $250
February 15,2012 Check 3130 $250
March 23, 2012 Check 3164 $250
Meigs’s Exhibit 22 shows the front of all those checks, but it only shows the backs, indicating that those checks had cleared, of only some of the checks. Based on our review of the evidence, it was reasonable for the trial court to conclude that Meigs’s Exhibit 22 substantiates the following $250 payments cleared after July 8, 2009:
December 20, 2011 Check 3071 $250
January 19,2012 Check 3070 $250[7]
February 15, 2012 Check 3130 $250
Based on our review of the evidence, it was reasonable for the trial court to conclude that Meigs’s Exhibit 22 does not substantiate that the following $250 checks cleared following July 8, 2009:
July 17,2009 Cheek 4105 $250
July 24, 2009 Check 4114 $250
October 1, 2011 Check 2450 $250[8]
November 25, 2011 Check 2562 $250
March 23, 2012 Cheek 3164 $250[9]
Based on the foregoing, we cannot say that the trial court erred in finding that Meigs made four $250 payments following July 8, 2009, and in giving Meigs credit in the amount of $1,000, instead of $2,000 for post-July 8, 2009, payments. Therefore, the trial court’s judgment insofar as it credits Meigs with making four $250 payments (totaling $1,000) after July 8, 2009, is affirmed.
Accordingly, the judgment of the trial court is affirmed in part and reversed in *891 part, and this cause is remanded for the entry of an order consistent with the opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, THOMAS, and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. We note that the complaint included a separate claim for additional moneys allegedly "had and received,” but, on motion of Meigs, that claim was dismissed on the basis that the estate lacked standing to assert that claim. In the complaint, the estate also alleged that, in 2007, certain amounts had been added to the balance of the loan, but it explained during the trial of the case that the loan balance that it asserted existed as of June 2008, which included the additional amounts allegedly added to the loan in 2007, was the proper balance of the loan at that time. During the trial of the case, the estate also waived any claims it had asserted regarding two checks in the amounts of $4,900 and $8,100, respectively. Finally, during the trial of the case and in its post-hearing briefs, the estate presented evidence and calculations regarding how it arrived at the total amount of money it claimed was owed by Meigs.
We also note that, before the trial of the case, Meigs filed a motion for a summary judgment, with supporting documentation, asserting, among other things, that, assuming that the debt was a personal debt, it had been discharged in April 2012 as part of Meigs and her former husband’s Chapter 13 bankruptcy proceeding, discussed infra. Meigs's motion for a summary judgment on that matter was denied.

. ■ The $50,000 loan proceeds consisted of the $3,000 check from Mobley, the $46,838 wire transfer from Mobley, and apparently the payment of a small attorney’s fee.

. Although the trial court entered a judgment for a lump-sum amount, it is clear from the record that it applied a 6% interest rate. See the estate's second post-hearing brief, quoted supra.

. Section 8-8-1 provides:
"Except as otherwise provided by law, the maximum rate of interest upon the loan or forbearance of money, goods, or things in action, except by written contract is $6 upon $100 for one year, and the rate of interest by written contract is not to exceed $8 upon $100 for one year and at that rate for a greater or less sum or for a longer or shorter time.”
Section 8-8-12 provides:
"(a) Except as otherwise permitted by law, all contracts for the payment of interest upon the loan or forbearance of goods, money, things in action, or upon any contract whatever at a higher rate than is prescribed in this chapter are usurious and cannot be enforced except as to the principal.
"(b) The borrower of money at a usurious rate of interest shall not in any case be required to pay more than the principal sum borrowed, and if any interest has been paid, the same must be deducted from the principal and judgment entered for the balance only; provided, however, that the defense of usury may not be pleaded against a holder in due course of any negotiable instrument.”

. We note that, in addition to other arguments the estate makes as to this issue in its brief on appeal, it reads Meigs's postjudgment motion as having "actually asked the trial court to apply a 6% interest rate.”

. In her initial brief to this court, Meigs also contends that the parties agreed to reduce the monthly payments from $750 to $500, and she requests that this court reverse the judgment on the acceleration-of-payments issue and instruct the trial court to enter a judgment based on payments in the amount of $500 per month that had accrued at the time of the entry of the judgment. However, Meigs fails to cite any legal authority in support of her assertion that the parties agreed to modify the oral agreement in her initial appellate brief. Rule 28(a)(10), Ala. R.App. P., requires that a party’s "argument” be supported by citations to legal authority. In other words, in order to be considered a proper "argument” for purposes of Rule 28(a)(10), citations to legal authority are required. Horn v. Fadal Machining Ctrs., LLC, 972 So.2d 63, 80 (Ala.2007) (the failure to cite legal authority has the same effect as if no argument had been made). Arguments not raised in the appellant’s initial brief are deemed waived; arguments made for the first time in the reply brief are not addressed by the appellate courts. Huntley v. Regions Bank, 807 So.2d 512, 516 n. 2 (Ala.2001). Although Meigs cites legal authority in her reply brief for the proposition that "Subsequent modifications of the original agreement are allowed,” those citations come too late because Rule 28(a)(10) requires compliance in an appellant's initial brief. See Huntley v. Regions Bank; see also L.J.K. v. State, 942 So.2d 854, 868-69 (Ala.Crim.App.2005) (Rule 28(a)(10) requires citations to legal authority and specific allegations relating to ineffective- *890 legal-counsel to be made in initial appellate brief; such citations and specific allegations may not be included for first time in reply brief).

. This check appears to be dated January 25, 2012.

. Meigs's Exhibit 22 reflects that the October 1, 2011, check had not cleared.

. This check appears to be dated March 22, 2012. We note that Meigs refers this court only to her Exhibit 22 for evidence that the payments had been made, and it was reasonable for the trial court to determine that that exhibit establishes only that three payments were made after July 8, 2009. Pursuant to Rule 28(a)(10), Ala. R.App. P., it is Meigs's duty to develop her argument with, among other things, “parts of the record relied upon.” It is not the duty of this court to search the voluminous documentary evidence in the record to see if "tucked away” in some other exhibit there is other evidence verifying that other additional checks have cleared. See Brown v. Brown, 719 So.2d 228, 230 (Ala.Civ.App.1998).